IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| PATRICIA GRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-0162-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Patricia Gray seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to give

controlling weight to the opinion of plaintiff's treating rheumatologist, Dr. Latinis, (2) finding

plaintiff's subjective complaints of disabling symptoms not credible, and (3) relying on an

improper hypothetical. I find that the substantial evidence in the record as a whole supports

the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary

judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On July 22, 2010, plaintiff applied for disability benefits alleging that she had been

disabled since June 20, 2010. Plaintiff's disability stems from fibromyalgia, endometriosis,[1]

migraine headaches, high blood pressure, anxiety, depression, post traumatic stress disorder,

sleep apnea and hypothyroidism. Plaintiff's application was denied on October 12, 2010. On

January 10, 2012, a hearing was held before an Administrative Law Judge. On February 22,

2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On

---

[1]Tissue that normally lines the inside of the uterus -- the endometrium -- grows outside the
uterus. Endometriosis most commonly involves the ovaries, bowel or the tissue lining the
pelvis.

December 13, 2012, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.	Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.	Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.	Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.	Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Stella Doering, in addition to documentary evidence admitted at the hearing.

## A.     *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1988 through 2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1988 | $ 1,052.64 | 2000 | $ 18,074.55 |
| 1989 | 2,698.56 | 2001 | 15,439.36 |
| 1990 | 238.59 | 2002 | 0.00 |
| 1991 | 850.63 | 2003 | 21,925.77 |
| 1992 | 1,398.38 | 2004 | 25,164.73 |
| 1993 | 485.03 | 2005 | 27,118.42 |
| 1994 | 1,408.13 | 2006 | 17,101.71 |
| 1995 | 59.50 | 2007 | 22,506.30 |
| 1996 | 5,476.26 | 2008 | 12,600.36 |
| 1997 | 9,209.42 | 2009 | 0.00 |
| 1998 | 3,840.00 | 2010 | 0.00 |
| 1999 | 19,768.30 | 2011 | 0.00 |

(Tr. at 163-164).

### Disability Report - Adult

In an undated Disability Report plaintiff reported that she stopped working on October 1, 2008 (Tr. at 179).  She explained as follows:

I was laid off in June of 2008 after returning from medical leave after major abdominal surgery to remove both ovaries due to endometriosis in March of 2008 and another major abdominal surgery to correct complications in May of the same year. I have collected unemployment benefits since, with the exception of the one position I found that lasted less than 60 days, as the employer stated I was being fired for excessive absenteeism. I missed a few days due to my conditions but they were exaggerated greatly by the employer. I actively looked for employment while collecting benefits, as my health continued to deteriorate. My unemployment benefits have since exhausted and now the pain and fatigue my illnesses cause have gotten so severe I am unable to look for employment. I even have to drop out of college as my illnesses are unpredictable, my pain is disabling, and my brain is affected by cognitive impairment and memory and comprehension problems. I cannot commit to the online schedule.

(Tr. at 179).

**Function Report**

On September 10, 2010, plaintiff completed a Function Report (Tr. at 211-218). Plaintiff described her day as supervising her children to make sure they all get to school, doing small household chores, making her lunch, resting a lot, talking with family and looking over her kids' homework, watching television, and playing board games. Plaintiff cannot shower daily because standing and bending over causes pain. Plaintiff is able to do dishes, fold clothes, and water indoor plants. Plaintiff goes out of the home a few times per week. When she does she is able to drive a car or ride in a car, and she is able to go out alone. She then added that she currently does not drive because the only car she has that runs is a stick-shift and it hurts her hip to push in the clutch. Plaintiff goes shopping about once a month with her husband and it takes about an hour. She is able to pay bills, handle a bank account, and count change. Not having money causes her stress which causes her to have anxiety attacks and increased physical pain. Plaintiff watches a movie at home once or twice a week, she watches television daily, spends time with her family daily, and goes to a concert once a year. Plaintiff visits with friends and family on the phone or through email.

Plaintiff's condition affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, concentrate, understand and follow directions. Her condition does not

affect her ability to use her hands, complete tasks, or get along with others.  Plaintiff has a gym membership but pain has kept her from using it to exercise.  She wrote, "No problem paying attention.  Keeping my attention is hard."  Plaintiff is able to follow written instruction "very well" but has difficulty with verbal instructions.  She is able to handle changes in routine fairly well.  Plaintiff checks her blood pressure "every few hours."

Plaintiff reported that bending over causes her to have a migraine headache.  Her fibromyalgia causes "cognitive impairment which has really affected my ability to understand, concentrate, remember things and be able to follow spoken instructions. This issue has caused me to go from a full time on campus college student who has made the President's List, to a part time online only student who is having to drop out of school due to difficulty in learning and concentration.  My grades have fallen as my health has.  I would have dropped already but my finances would not allow me to pay back the disbursements already made."

## Missouri Supplemental Questionnaire

In a Missouri Supplemental Questionnaire dated September 10, 2010, plaintiff reported that she is able to use a computer for about 10 to 15 minutes at a time "before needing a break to get up and move around" (Tr. at 219-221).

## Function Report - Third Party

On September 10, 2010, plaintiff's husband completed a Function Report - Third Party (Tr. at 189-196).  Mr. Gray stated that plaintiff spends her days supervising the children to make sure they get on and off the bus, she spends her evenings with her family, and she rests a lot during the day.  Mr. Gray reported that when plaintiff goes out, she is able to drive and is able to go out alone (Tr. at 192).  Plaintiff is able to pay bills, handle bank accounts, and count change.  He reported that plaintiff used to go to concerts, events, and carnivals, but she no longer can (Tr. at 193).  He reported that plaintiff's condition affects her ability to lift, sit,

climb stairs, understand, squat, kneel, bend, talk, follow instructions, stand, reach, complete

tasks, walk, remember and concentrate (Tr. at 194). Her condition does not affect her ability

to use her hands. He said that plaintiff uses a cane daily around the house (Tr. at 195).

**B.    SUMMARY OF TESTIMONY**

During the January 10, 2012, hearing, plaintiff testified; and Stella Doering, a

vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

At the time of the hearing, plaintiff was 39 years of age and was living in Harrisonville

with her husband, two 18-year-old children, and her minor-aged child (Tr. at 25-26).

Plaintiff was 5'3" tall and weighed 120 pounds (Tr. at 26). Plaintiff has a high school

education and two years of college (Tr. at 26). She left college after two years because she has

a cognitive impairment and could not concentrate (Tr. at 32). She would read a paragraph

three or for times and could not remember what it said in order to answer the question (Tr. at

32). She started college at DeVry in mid-2008 (Tr. at 32). She began as a full-time on-

campus student, but she had to switch to on-line classes because she could not function

correctly in the school (Tr. at 32). She then switched to part time and eventually dropped out

(Tr. at 32). She had a 4.0 grade point average, but "it just declined" (Tr. at 32). She dropped

out of college in October 2010 (Tr. at 32). Although plaintiff was not diagnosed with any

cognitive problems, she has fibromyalgia which includes "brain fog" (Tr. at 32). She has

memory issues[2] (Tr. at 32).

---

[2]Despite testifying about memory problems, plaintiff was able to correct her attorney and
the ALJ during questioning and had no trouble remembering her work history, the number of
days she held a job in 2008, the number of days she missed during her tenure of employment
and why, the name of a previous employer as well as the name of its holding company; she was
able to recall the names and specific dosages of all of her prescription medication, the
definitions of different diseases, and the ingredients in prescription medications (Tr. at 33-36,
39, 59, 61, 64, 67, 72).

Plaintiff was diagnosed with fibromyalgia in approximately 2004 (Tr. at 32). She was "rediagnosed" in 2009 (Tr. at 32-33). By 2010 the fogginess had gotten so bad that she could not look for work anymore (Tr. at 33). It was hard for her to concentrate on the internet while looking for jobs (Tr. at 33).

Plaintiff last worked in October 2008 (Tr. at 33). She looked for work from October 2008 until her alleged onset date on June 20, 2010 (Tr. at 53). At her last job she worked full time answering phones, filing, and doing data entry (Tr. at 33). She had the job for 58 days and was let go for missing too much work "due to my health conditions" (Tr. at 33-34). I note that plaintiff testified she started college full time in mid-2008 which would be just prior to this two-month term of full-time employment, and during the hearing plaintiff acknowledged that she was in college until October 2010 (Tr. at 53). Plaintiff missed a total of five days during her last job -- two days were prearranged appointments that her boss knew about before plaintiff was hired; three days she called in sick because she was "too ill or sore to go to work" (Tr. at 34). Plaintiff was experiencing nausea, pain, and vomiting (Tr. at 34).

Plaintiff worked for 3 years in another clerical job sitting at a desk and answering phones and doing data entry (Tr. at 35). She had her ovaries removed due to endometriosis in March 2008, and 8 weeks later she had to have another surgery due to hemorrhaging (Tr. at 35). She went back to work and the next day was told that she was laid off (Tr. at 35, 69). If she had not been laid off, she would not have been able to continue working (Tr. at 69).

Plaintiff worked for that same company earlier as a team lead -- she supervised employees but did not have the ability to hire or fire (Tr. at 35-36). She worked for Rebar Powerlift for 4 or 5 months in 2001 doing telephone sales, but she lost her job when the company downsized (Tr. at 36).

Plaintiff cannot do telephone sales anymore because she is unable to sit in a chair without having to get up to stretch (Tr. at 36). She cannot stand to put fork truck parts away (which was part of her telephone sales job) because they are now too heavy for her to lift (Tr. at 36). When plaintiff was asked why she would not be able to do a data entry type job anymore, she said, "I know that most employers don't want their employees getting up to stand every hour when they're supposed to be sitting at your desk." (Tr. at 37). She was asked why she could not work if she were given the option to stand and sit at leisure, and she said, "I feel my pain, it's just too . . . unpredictable. That with my migraine headaches, it's very unpredictable that I would be able to commit to a five day a week job." (Tr. at 37).

Plaintiff believes that her pain, fatigue, cognitive impairment, and side effects from medication prevent her from working any job full time (Tr. at 37). Plaintiff's fibromyalgia flares up every day (Tr. at 38). When she was working, she would call in sick when she had a flare up which was maybe once every couple of months (Tr. at 38). Since June 2010, her flare ups have been daily (Tr. at 38). Plaintiff has a tender-point test every three months, and she has 18 out of 18 tender points (Tr. at 38). Plaintiff's rheumatologist prescribes time-released OxyContin twice a day and Oxycodone for breakthrough pain (Tr. at 39). On average, plaintiff's pain is an 8 or 9 out of 10 every day even with medication (Tr. at 40).

Plaintiff's doctor prescribed exercise to help with her fibromyalgia pain (Tr. at 40). She started out taking walks with her daughter, and she would go swimming at the local pool (Tr. at 40-41). Now all she can do is simple stretches while sitting down (Tr. at 41). Plaintiff's fibromyalgia pain is primarily in her neck and shoulders (Tr. at 63).

Plaintiff's medications help her back arthritis some (Tr. at 41). She was unable to take anti-inflammatories because she gets a burning stomach, she vomits, and she is nauseated all the time, so her doctor no longer prescribes anti-inflammatories (Tr. at 41).

Plaintiff has pain from head to toe; however, she has additional pain in her left shoulder (Tr. at 41-42). She has a fluid pocket on her shoulder which is bursitis (Tr. at 67). She has had one injection in that shoulder and she took Prednisone for that as well (Tr. at 42). Her doctor does not anticipate doing another injection or renewing her Prednisone -- plaintiff was told her shoulder pain is something she would need to "learn to live with" (Tr. at 42). Plaintiff has heard that the fluid can be removed with a needle, but she did not hear that from her doctor (Tr. at 67).

Plaintiff has endometriosis, despite having had her uterus removed (Tr. at 59). She has had this since before 2010 and it causes daily "massive pain" (Tr. at 59, 64). She rates her daily pelvic pain a 6 out of 10 in severity (Tr. at 64). She was able to work with it prior to her alleged onset date; she forced herself to work, even though her pain was actually worse then than it is now (Tr. at 60, 64).

Plaintiff was diagnosed with hypothyroidism in 2005 (Tr. at 63). This condition does not affect her ability to work (Tr. at 64).

Plaintiff has fibromiosis for which she was taking Percocet (narcotic) in 2009 (Tr. at 60). Her doctor then prescribed Fentanyl patches (narcotic more potent than morphine) in addition to the Percocet (Tr. at 61). Percocet is Oxycodone (narcotic) with Acetaminophen -- her doctor later switched her to Oxycodone without the Acetaminophen so she would not harm her liver (Tr. at 61). Plaintiff's narcotic pain medications cause fatigue, constipation, and dizziness (Tr. at 71).

Plaintiff uses a cane because she has balancing issues and because she needs something to lean on due to her pain (Tr. at 43). No doctor prescribed it; plaintiff bought it at a drug store a year and a half earlier (Tr. at 43). Her doctor has seen plaintiff come into the office with the cane, and he has never told her she does not need it (Tr. at 43). Plaintiff uses the cane

about 2 days a week at home, and she uses it when she leaves home (Tr. at 43). Plaintiff loses her balance and falls; the last time that happened was about 5 months ago "and that was reported to my rheumatologist" (Tr. at 44).

Plaintiff can walk a block at the most, and she needs her cane to do that (Tr. at 44-45). Plaintiff can stand for an hour at a time without moving, but that is all the standing she can do in an 8-hour workday (Tr. at 45, 69). Plaintiff can sit for an hour at a time before needing to get up and move around (Tr. at 69). Plaintiff can barely lift a 10-pound bag of potatoes,[3] so her husband does most of the grocery shopping (Tr. at 45).

Plaintiff has headaches every day, and she suffers from periodic migraine headaches (Tr. at 46). When plaintiff gets a migraine headache, she has to stay in a dark room with no noise, and she takes Imitrex which helps (Tr. at 46, 66). Nothing -- prescription or over-the-counter -- helps plaintiff's daily headaches (Tr. at 46). She has had the daily headaches for "quite some time" and is functioning with them (Tr. at 46). She gets migraine headaches once or twice a month, and they last from 3 to 7 days (Tr. at 46, 65). Plaintiff's migraine headaches began in 2010 (Tr. at 65-66).

Plaintiff takes Xanax because her fibromyalgia causes anxiety and she has panic attacks a lot (Tr. at 47). Her rheumatologist prescribed it (Tr. at 47). She saw a psychiatrist in 2005 and 2006 (Tr. at 47). She was on a lot of medications back then for her mental condition (Tr. at 48). Plaintiff has panic attacks over anything stressful -- money issues, deaths in the family, any kind of normal everyday stress (Tr. at 48). Even with the Xanax, plaintiff has about two panic attacks per week (Tr. at 49). They last 3 minutes to an hour[4] (Tr. at 49). Plaintiff believes

---

[3]She later said she in fact could not lift a 10-pound bag of potatoes (Tr. at 68).

[4]The transcriptionist typed "45 minutes" to an hour; however, elsewhere in the transcript the duration of plaintiff's panic attacks is described as 3 minutes to an hour (Tr. at 58).

her depression stems from her fibromyalgia, but her post traumatic stress disorder stems from her childhood and her first marriage when she was 17 (Tr. at 48). She continues to have flashbacks and nightmares, and if she sees channel locks she "flips out" because she was once beaten unconscious with that tool (Tr. at 48).

Plaintiff was diagnosed with depression in 2005 by Steven Samuelson (Tr. at 55). She was prescribed so many medications she could not recall them all (Tr. at 55). (None of these records were presented in connection with this case). She stopped taking medication for depression in 2008 when she lost her job (Tr. at 55-56). At her alleged onset date, she was not taking any medication for depression (Tr. at 55). Plaintiff was diagnosed with anxiety by Dr. Samuelson, and she stopped taking medication for that the same time she stopped her depression medication (Tr. at 56). Plaintiff suffers from post-traumatic stress disorder which was first caused by growing up with an abusive step father (Tr. at 56-57). He was removed from the home due to the physical abuse he inflicted on plaintiff and her mother (Tr. at 57). When asked if she was ever hospitalized due to her emotional problems, she said she was but she could not say when other than to narrow it down to prior to 2010 (Tr. at 57). Plaintiff does not remember a time when she did not have panic attacks (Tr. at 57-58). She was able to work despite her history of panic attacks (Tr. at 58). When she was working she had a panic attack about once a month, but she never missed work because of it (Tr. at 58).

Plaintiff's husband does the cooking, cleaning, and shopping (Tr. at 49). If plaintiff shops she has to do it on line, and she's "not even been able to do that" (Tr. at 50). Her husband takes care of the dog (Tr. at 49). Plaintiff tries to do the dishes (Tr. at 49). She can stand at the sink for about 5 minutes before she has to go sit down and rest (Tr. at 49-50). Plaintiff stopped driving a year before the hearing because she caught herself going over the line and she did not want to harm anyone (Tr. at 50).

Plaintiff's husband works (Tr. at 50). Plaintiff spends her entire day lying in bed or on the couch watching television (Tr. at 50-51). Plaintiff lives in pajama bottoms and tank tops -- she does not ever get dressed unless she has to leave her home (Tr. at 51). Plaintiff talks to her best friend on the phone "all the time" (Tr. at 52). Plaintiff's friend comes to visit, but plaintiff is not able to go visit her friend or her family (Tr. at 52).

2.    **Vocational expert testimony.**

Vocational expert Stella Doering testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes that classified as SVP 5 and 4 (Tr. at 74).

The first hypothetical involved a person who could perform work limited to simple, routine, repetitive work with an SVP of no higher than 2; limited contact with the consuming public; a sit-stand option at will; no repetitive overhead lifting or reaching; no repetitive twisting or turning of the neck; no lifting from the floor level, crawling, kneeling, crouching, squatting, or repetitive twisting or turning of the body; no work at unprotected heights, around dangerous or moving machinery, or involving driving automobile equipment; occasional bending and use of the hands for fingering, reaching or handling (Tr. at 76, 77). The vocational expert testified that such a person could not do any of plaintiff's past relevant work (Tr. at 76). Her past relevant sedentary jobs have all been above SVP of 2 (Tr. at 77). A person with this residual functional capacity could work as a surveillance system monitor, DOT 379.367-010, with 400 in Missouri and 20,000 in the country, or a call out operator, DOT 237.367-014, with 895 in Missouri and 83,900 in the country (Tr. at 77-78).

The second hypothetical was the same as the first except the person would be absent from work for three days per month due to migraine headaches (Tr. at 78). The vocational exert testified that such a person could not perform substantial gainful activity (Tr. at 78-79).

The third hypothetical involved a person who, because of a panic attack, would be nonfunctional for 2 to 30 minutes once a week (Tr. at 79). The vocational expert testified that this would not affect the person's ability to work (Tr. at 79).

The vocational expert reviewed the Medical Source Statement of Dr. Latinis and found it internally inconsistent (Tr. at 81). For example, he found that she could only occasionally perform simple grasping and fine manipulation of both the right and the left hand, but he also found that she could frequently handle and feel (Tr. at 81). His conclusion that she suffers pain, fatigue, and reduced stamina that would "significantly reduce [her] ability to function effectively in the workplace" is not helpful because he did not include his idea of "effectively" being able to work (Tr. at 82). Because of the inconsistencies in the way Dr. Latinis completed the form, the vocational expert testified that she "could not use this information and definitely eliminate those jobs." (Tr. at 82, 84). Dr. Latinis's finding that plaintiff cannot sit, stand and walk for a total of 8 hours per day would preclude full-time employment (Tr. at 84).

C.     *SUMMARY OF MEDICAL RECORDS*

Many of plaintiff's medical records are dated prior to her June 20, 2010, alleged onset date.

On March 10, 2008, Eugene VandenBoom, M.D., performed a bilateral salpingo-oophorectomy (removal of both ovaries and fallopian tubes) due to complaints of pelvic pain and ovarian cyst (Tr. at 247-250, 336-337, 339). Plaintiff had had her uterus removed in 2002 (Tr. at 340, 344). She was smoking a half a pack of cigarettes per day.

On March 23, 2008, plaintiff saw Sean Fulton, M.D., complaining of increasing abdominal pain since her surgery (Tr. at 244-246, 266). Plaintiff's past medical history included only hypothyroidism, history of ovarian resection, and history of bulging disks in her neck. Plaintiff denied headaches. Her blood pressure was 98/78. Plaintiff's physical exam

was normal except the abdominal pain; and she was noted to be pleasant, alert and oriented times three with good insight. A CT scan of the abdomen showed a likely hematoma.[5] Plaintiff's treating physician was contacted and outpatient management was recommended. Plaintiff was discharged with a prescription for Percocet (narcotic) and Phenergan (for nausea).

On May 16, 2008, plaintiff had an abdominal ultrasound which was compared to a CT of her abdomen and pelvis done on April 14, 2008 (Tr. at 320-323). It was determined she had two fluid filled collections consistent with hematomas.

Plaintiff was in the hospital from May 22, 2008, through May 24, 2008 -- she had exploratory laparotomy to drain a cyst and hematoma (Tr. at 239-243, 268, 334-335). Plaintiff continued to smoke a half a pack of cigarettes per day.

On June 3, 2008, plaintiff saw Dr. VandenBoom for a follow up on her laparotomy (Tr. at 400). She reported feeling much better. "The discomfort she experienced before the surgery has gone." Plaintiff was planning to return to work in 8 days, or on June 11. "She is on Darvocet [narcotic] for pain relief now. Once she runs out of this she is to start ibuprofen p.r.n. [as needed]."

On June 24, 2008, plaintiff saw Dr. VandenBoom for a follow up (Tr. at 400). "She lost her job this Wednesday and had to empty [out her] office on Friday and she has a soreness in the area of her incision now and wonders if there was some damage. The incision has healed well. There is no sign of hernia or infection. There is no sign of recurrence of the hematoma. Patricia states she just needs some pain pills occasionally. I agreed to write her a few more Lortab [narcotic], but no more because by this time she will be past four weeks." He prescribed

---

[5]A hematoma is a collection of blood, usually clotted, outside of a blood vessel that may occur because of an injury to the wall of a blood vessel allowing blood to leak out into tissues where it does not belong.

20 tablets of Lortab.

On July 10, 2008, Dr. VandenBoom prescribed 10 more Lortab [narcotic] pills and wrote, "<u>No more</u> refills".

On December 22, 2008, plaintiff had an MRI of her lumbar spine showing a desiccated disc at L3-4 "but no significant narrowing of the canal or neural foraminal narrowing is noted at any level" (Tr. at 283).

On March 20, 2009, plaintiff saw Dr. VandenBoom with complaints of headaches that "are not migraine headaches" (Tr. at 398). Dr. VandenBoom prescribed Percocet, a narcotic, 10 tablets with no refills. "She is not to have any more narcotic analgesics for her headaches. . . . Patty says she is under a great deal of stress."

On May 7, 2009, plaintiff saw Kevin M. Latinis, M.D., Ph.D., a rheumatologist, for an evaluation of fibromyalgia and generalized pain (Tr. at 282, 446). Plaintiff reported having been diagnosed with fibromyalgia in 2004 and she said she also had generalized pain disorder. "Currently, she is not on any pain medicine, but she takes 800 mg of ibuprofen every 4-6 hours. This is causing significant GI [gastrointestinal] discomfort. She was treated last month after OB procedure with Percocet [narcotic], and this helped out significantly with her pain." Plaintiff denied depression but reported fatigue despite sleeping uninterrupted. Plaintiff's blood pressure was 130/100. "In general, she is a middle-aged female in no acute distress. . . . Musculoskeletal exam is notable for 18/18 fibromyalgia tender points." Dr. Latinis assessed fibromyalgia, generalized pain, and tobacco abuse. Dr. Latinis prescribed Percocet (narcotic), Flexeril (muscle relaxer) and "mandated that she start an exercise program of 3-4 days, 30-60 minutes of aerobic exercise."

On June 4, 2009, plaintiff saw Dr. Latinis for a follow up on fibromyalgia, generalized pain and anxiety disorder (Tr. at 281, 447). "Overall, she feels she is doing much better, pain

levels are much better." Plaintiff's physical exam was "unchanged. She is simply anxious and has diffuse tender points." He assessed fibromyalgia and anxiety disorder. He increased her Percocet (narcotic). He discontinued Klonopin (anti-anxiety) and "switch[ed] her back to a medicine that has previously worked better in the form of Xanax [anti-anxiety]".

On July 2, 2009, plaintiff saw Dr. Latinis for a follow up on fibromyalgia, generalized pain, and smoking cessation (Tr. at 280, 448). "She has done really well. She has a significant decrease in her stress. Her pain levels are very manageable, and she wants to work on quitting smoking." Plaintiff's physical examination was "unchanged." Her blood pressure was 120/80. Her mood and affect were "very stable". No tender points were noted. Dr. Latinis assessed fibromyalgia, generalized pain, and tobacco addiction. Her told her to continue taking Xanax (anti-anxiety) and exercise for her fibromyalgia, and he told her to continue using Percocet (narcotic) as needed for generalized pain. He wrote her a prescription for Chantix to help her stop smoking.

On August 27, 2009, plaintiff saw Dr. Latinis for a follow up on fibromyalgia (Tr. at 279, 449). She had decided not to use the Chantix prescription but cut down to 3 cigarettes a day. "Her anxiety seems to be well compensated. Pain control is doing well on her current dose of Percocet [narcotic], although she complains of increased symptoms of spinal arthritis across her low back and up her spine, worse with standing and activity, better with rest. She is not having any muscle spasms, but does improve with massage therapy. She has had a few migraines recently." Plaintiff's blood pressure was 120/70. No tender points were noted on exam. He assessed fibromyalgia and generalized pain. He increased her dosage of Flexeril (muscle relaxer) and increased her dosage of Percocet (narcotic).

On October 29, 2009, plaintiff saw Dr. Latinis for a follow up on fibromyalgia, sleep disorder, and smoking (Tr. at 278, 453-455). "She comes in today actually feeling really good.

Her pain control is optimized on the current regimen. She does have variable days, where some days are worse than others, particularly associated with weather changes." Plaintiff had quit smoking on her own and did not have to use Chantix. "She feels like she is sleeping well with the use of Flexeril [muscle relaxer]." Plaintiff's new complaint was daily headaches. On exam her vital signs were stable. "In general, she is a healthy middle-aged female in no acute distress. Mood and affect are appropriate." No tender points were noted. Dr. Latinis assessed fibromyalgia. He continued her on Percocet (narcotic) on an as-needed basis, Xanax (for anxiety) on an as-needed basis, and Flexeril for fibromyalgia and sleep.

On December 22, 2009, plaintiff saw Dr. Latinis for a follow up on fibromyalgia and generalized pain (Tr. at 277, 463). "Over the last few months, she has had increased stress with increased pain. Her sleeping is doing better. We discussed exercising at length today." Plaintiff's blood pressure was 137/86. "In general, she is a young female in no acute distress. Mood and affect are stable. She has diffuse fibromyalgia tender points and some generalized anxiety that is apparent on exam." He assessed fibromyalgia and generalized pain. He added Fentanyl (narcotic more potent than morphine), and he continued her Xanax (for anxiety) and Percocet (narcotic) as needed for pain.

On February 25, 2010, plaintiff saw Dr. Latinis for a follow up on fibromyalgia and generalized pain (Tr. at 276, 470). "She continues to be stable." Plaintiff complained of some shoulder pain. Although she was able to fall asleep, she had trouble staying asleep which caused fatigue. "Otherwise everything looks unremarkable." Plaintiff's blood pressure was 138/98. "In general, she is a healthy, middle-aged female in no acute distress. Mood and affect are appropriate. . . . She has diffuse musculoskeletal tender points consistent with fibromyalgia." Dr. Latinis assessed fibromyalgia, generalized pain disorder, and tobacco abuse, although he noted that she had stopped smoking. He continued her on fentanyl (narcotic) and

indicated he would increase her Percocet (narcotic) slightly over the next few months. "I have encouraged her to initiate an exercise program that includes aerobic activity and stretching. . . . I spent 25 minutes of which greater than half the time was spent coordinating and counseling regarding appropriate initiation and maintenance of an aerobic exercise program."

On April 15, 2010, plaintiff saw Dr. Latinis, for a follow up on fibromyalgia and generalized pain (Tr. at 275, 478). "She has been doing very well recently. We got her pain control relatively optimized. She has had a few flares with increased pain in her shoulders and her left 1st MTP joint [big toe], but otherwise she copes with her fibromyalgia quite well. She is active in a blog support group, and has increased her physical fitness doing yoga, Pilates, and home dancing exercises up to two times a week now." Plaintiff reported persistent fatigue, improved symptoms of constipation, fluctuating musculoskeletal pain, but no other symptoms. On exam plaintiff's vital signs were stable, mood and affect were positive. "She just has generalized fibromyalgia tender points." Plaintiff was assessed with fibromyalgia and generalized pain. He prescribed fentanyl patch (narcotic) and Percocet (narcotic). "I will have her maintain her activity, and we talked about ways she can actually increase this to improve her endurance, lessen her fatigue, and improve her sleep." He told her to come back in three months for refills.

On April 28, 2010, plaintiff saw Dr. VandenBoom (Tr. at 396). Plaintiff reported that she had been on estrogen replacement due to her hysterectomy, but she started having pelvic pain. She stopped the medication and the pain went away, but she started having hot flashes and urinary frequency at night which caused daytime fatigue. Dr. VandenBoom prescribed a different kind of estrogen replacement therapy.

Plaintiff's alleged onset date is June 20, 2010.

On June 17, 2010, plaintiff saw Robert Wheeler, M.D., for urinary problems (Tr. at 437-438). Her blood pressure was 152/98. She rated her pain a 10 out of 10, and her current medications included Fentanyl and Percocet, both narcotics. Dr. Wheeler noted that plaintiff was in no acute distress. Her gait and stance were normal. On exam she had tenderness in her shoulder area. He prescribed Keflex, a muscle relaxer, and he gave her an injection of Rocephin (treats bacterial infections).

On July 7, 2010, plaintiff saw Dr. Wheeler to discuss tests for back pain (Tr. at 435-436). "Pt here with chronic lumbar pain which has been worse the past 3 weeks. No relief with percocet which as been prescribed by her rheumatologist????? No help with Aleve. Told she has ddd [degenerative disc disease]." Plaintiff also continued to take Fentanyl, a narcotic, in addition to Percocet, a narcotic. She rated her pain a 7, despite taking the narcotics. Dr. Wheeler observed that plaintiff was in no acute distress. Her blood pressure was 147/92. On exam of plaintiff's musculoskeletal system, Dr. Wheeler noted pain with palpation in plaintiff's lumbar area. Her gait and stance were normal. Overall findings were normal other than the lumbar pain. Dr. Wheeler assessed low back pain and recommended an MRI.

On July 9, 2010, plaintiff was seen by Dr. Simon Warren in the emergency room for a rash (Tr. at 480-483). In triage, she reported that her pain level from constipation was a 9 out of 10, her generalized all-over-body pain was a 7 out of 10. She continued to take Fentanyl and Percocet, both narcotics; Flexeril, a muscle relaxer; and Xanax for anxiety. On exam, she had normal range of motion and no tenderness in her extremities. Her abdomen was nontender. She was oriented times three, her mood and affect were normal. She denied headache, leg pain, neck pain, joint pain. She was assessed with hives and told to use over-the-counter Benadryl.

On July 11, 2010, plaintiff returned to the emergency room complaining of abdominal pain and vomiting over the past three days (Tr. at 491-507). She was observed to be anxious. She rated her pain a 6 out of 10. On exam she had abdominal tenderness but no tenderness in her back or extremities. She was oriented times three with normal mood and affect. She had a CT scan of her chest which was normal. She was assessed with gastritis (inflammation of the stomach lining).

On July 13, 2010, plaintiff saw Dr. Latinis for a follow up on fibromyalgia (Tr. at 274, 515). "She has been well" but over the past four to six weeks plaintiff had had viral gastroenteritis, urinary tract infections, a yeast infection, and hives. A review of systems showed plaintiff complained of fatigue, rashes, nausea, vomiting, diarrhea, and muscle pain, but "the remainder of her systems are unremarkable." Plaintiff's blood pressure was 148/100. "Musculoskeletal exam reveals diffuse generalized tenderness." She was assessed with fibromyalgia and generalized pain. He refilled plaintiff's Fentanyl and Percocet prescriptions and told her to come back in three months.

On July 22, 2010, plaintiff applied for disability benefits.

On August 12, 2010, plaintiff saw Dr. Suarez complaining of migraines and bilateral hip pain over the last several months, worse with lying on her side (Tr. at 383). Plaintiff reported elevated blood pressure over the last few months, although her blood pressure on this day was 128/98. Dr. Suarez assessed migraine, bilateral trochanter bursitis, and hypertension. He prescribed Topamax for her migraines and Maxzide for hypertension, and he gave plaintiff an injection of Lidocaine (anesthetic) and Depo Medrol (anti-inflammatory) in her hip.

On September 13, 2010, plaintiff saw Dr. Suarez for a follow up on blood pressure and hip pain (Tr. at 382). Unchanged since her prior visit was "migraine." Her medications were the same and she denied medication side effects. Her blood pressure was 110/96. She

reported that her hip pain was worse when "lying on affected side, standing up from sitting position." Even though plaintiff's blood pressure was 110/96, Dr. Suarez diagnosed uncontrolled hypertension.

On October 8, 2010, Martin Isenberg, Ph.D., completed a Psychiatric Review Technique in connection with plaintiff's application for disability benefits (Tr. at 359-370). He found that plaintiff's mental impairment was not severe. He found that she had no restriction in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. In support of his findings, Dr. Isenberg wrote the following:

> Clmt is 37 y/o with 14 yrs education alleging fibromyalgia, arthritis, endometriosis, migraine headaches, high blood pressure, anxiety, depression, PTSD, sleep apnea, and hypothyroidism with an AOD of 10/01/08. . . . Clmt reports daily she supervises her children, does small household chores, prepares simple meals, spends time with family watches TV, and manages blood pressure throughout the day. She states she has pain which is chronic and very unpredictable at times. Clmt reports difficulty with sleeping, personal care, memory, concentration, understanding, and following instructions. She states she doesn't need reminders for personal care but does for medication, is able to manage money, has no problem paying attention but keeping attention is hard, does very well with written instructions, gets along with authority, does fairly well with changes in routine, but does not do well with stress. Clmt reports she goes outside, can go out alone, is able to drive, shops, watches movies, talks on the phone, and goes to doctor appointments. Clmt indicated she did not need help completing paperwork. 3rd party report is consistent with clmt ADL form. FO observed no difficulty with understanding, concentrating, coherency, or answering during teleclaim.
>
> Medical records indicate clmt has a history of fibromyalgia and anxiety. In 5/09 clmt reported she doesn't feel like she is depressed, just fatigued and in generalized pain. In 6/09 clmt reports she feels she is doing much better, on exam is anxious and has diffuse tender points. Dx: Fibrom, Anxiety, d/o; rx Xanax. At f/u 7/09 clmt reports having done really well with significant decrease in her stress and pain manageable. Records from 8/09 noted clmt's anxiety seems to be well compensated. In 10/09 clmt's mood and affect were appropriate. In 12/09 clmt reports over last few mths has had increased stress with increased pain. On exam mood and affect stable, some generalized anxiety, diffuse tender points. Add fentanyl. Records from 2/10 indicate clmt continues to be stable, mood and affect appropriate. In 4/10 clmt reports doing very well, active in blog support group and does yoga, Pilates, and home dancing exercises up to two times a week now; mood and affect positive. At f/u 7/10 records indicate clmt hd been well but over last 4-6 weeks has had viral gastroenteritis and pain level has increased as she has been sick.

Based on all evidenced clmt's allegations are partially credible. Records do not support the severity of limitations the clmt reports, or really any psychiatric-based limitations. Clmt's anxiety is managed on medication. She does not appear to be seeking any specific treatment for her mental impairment. Despite her impairment clmt reports she is able to manage money, prepare meals, watch movies, drive, and perform other ADLs as physically able. Currently it is reasonable to consider clmt's mental impairment is non-severe.

On October 14, 2010, plaintiff was seen by Dr. Latinis for a follow up on fibromyalgia (Tr. at 518-527). She was noted to be alert and fully oriented, but she was ambulating with the assistance of a cane. Under review of systems, psychiatric was noted to be normal. Under "musculoskeletal," Dr. Latinis wrote "pain." Although there is a diagram on the form for tender points, it was not completed. Plaintiff's blood pressure was 122/59. She was observed to be in no acute distress, her mood and affect were appropriate. She appeared fatigued. "Musculoskeletal exam is notable for multiple tender points in a fibromyalgia distribution." X-rays of plaintiff's hips and pelvis were normal. Dr. Latinis refilled plaintiff's Fentanyl and Percocet, both narcotics. "I encouraged her to increase her exercise. I am going to change her Flexeril [muscle relaxer] over to baclofen [treats muscle spasms]". He told plaintiff to return in four months.

On October 25, 2010, plaintiff saw Alberto Suarez, M.D., for a fever and body aches (Tr. at 381). Her blood pressure was 98/64. She was assessed with bronchitis.

On November 11, 2010, plaintiff was seen at Rockhill Women's Care by Dr. VandenBoom for a condition unrelated to her disability case (Tr. at 388-395). She listed her medications as Atenolol (for hypertension), Bentyl (for irritable bowel syndrome), Dicyclomine (for irritable bowel syndrome), Estrodiol (for symptoms of menopause), Fentanyl patch (narcotic), Fioricet (a barbiturate prescribed for headaches), Percocet (narcotic), Provera (female hormone), Soma (muscle relaxer), Tirosint (synthetic thyroid hormone), and Xanax (for anxiety). Under past medical history, there is no positive response under "headaches."

Plaintiff's social history states that she began using methamphetamine at age 20, used it periodically, and is currently a former user. She reported started tobacco use at age 12, she smoked 1/2 to 1 pack per day, and her current usage was "unknown."

On January 12, 2011, plaintiff saw Douglas Tietjen, M.D., a urologist, at the request of Dr. VandenBoom due to plaintiff's complaints of pelvic pain (Tr. at 387, 418). Plaintiff's symptoms related to her bladder. Dr. Tietjen assessed "female pelvic pain" and prescribed medication for overactive bladder.

On January 25, 2011, Dr. Tietjen performed a scope of plaintiff's bladder due to complaints of overactive bladder (Tr. at 414). The results were normal, and he indicated he would manage any further symptoms with medication.

On February 3, 2011, plaintiff saw Dr. Latinis for a follow up on fibromyalgia (Tr. at 528-535). Although the medical form includes a diagram for fibromyalgia tender points, it was not completed. Plaintiff described her pain as an 8 out of 10 due to abdominal pain thought to be endometriosis. Plaintiff was observed to be in no acute distress with normal mood and affect. "Musculoskeletal exam has fibromyalgia tender points along paraspinal muscles." Dr. Latinis refilled all of plaintiff's medications and told her to return in three months.

On February 14, 2011, plaintiff saw Jamie Zurcher, a nurse practitioner, complaining of night sweats and constipation (Tr. at 431-434, 539-542). Plaintiff said she had been treated with Fioricet (a barbiturate) for headaches by Dr. Suarez but she had recently been discontinued as a patient. "She was curious if she could get some more of those." Plaintiff's current medications included Fentanyl and Percocet, both narcotics. Plaintiff's blood pressure was 115/90. Plaintiff's back exam was normal. She was given a prescription for Fioricet and was referred for a colonoscopy.

On February 21, 2011, plaintiff had a colonoscopy which was normal (Tr. at 550). A high fiber diet and a daily fiber supplement were recommended.

On March 14, 2011, plaintiff saw Dr VandenBoom with continued complaints of constipation and nighttime hot flashes (Tr. at 421-422). On exam her mood and affect were appropriate. Dr. VandenBoom changed plaintiff's hormone replacement medication and told her to use an over-the-counter laxative.

On April 11, 2011, plaintiff saw Dr. VandenBoom complaining of constipation (Tr. at 423). Her hot flashes had improved some. Dr. VandenBoom noted that plaintiff's recent colonoscopy had been normal. She said over-the-counter laxatives were not helping. Plaintiff complained of lower abdominal pain and pelvic pain similar to the pain she had before her procedure for endometriosis. "She wonders if some pathology is back. She wonders if she needs surgery. I explained that would be a last resort option." Dr. VandenBoom recommended an abdominal and pelvic CT scan.

On April 28, 2011, plaintiff saw Dr. Latinis with a complaint of shoulder pain over the last week (Tr. at 555-564). She rated her shoulder pain an 8 out of 10. "Her anxiety level is a bit high due to family stressors, mostly financial." Plaintiff's blood pressure was 134/79. She was noted to be in no acute distress, her mood and affect were appropriate. She had a left shoulder x-ray which was normal. Although the medical form included a diagram for fibromyalgia tender points, it was not completed. "Musculoskeletal exam fibromyalgia tender points are positive. She had tenderness stressing her rotator cuff with internal-external and abduction, and also positive impingement sign." Dr. Latinis gave plaintiff an injection of Depo Medrol and Lidocaine in her left shoulder and refilled all of her medications. He told her to come back in three months.

On May 19, 2011, plaintiff saw Andrew Green, M.D., an endocrinologist (Tr. at 377-378). Plaintiff testified that her hypothyroidism does not affect her ability to work; therefore, I have not included in the summary those medical records pertaining to that condition. However, I do note that at this appointment, plaintiff did not list Fentanyl as a current medication. Plaintiff reported a history of fibromyalgia, arthritis, migraine headache and irritable bowel syndrome. Her medications were alprazolam (Xanax, for anxiety), Percocet (narcotic), Soma (muscle relaxer) and Bentyl (treats irritable bowel syndrome). She was described by Dr. Green as a pleasant woman. Her blood pressure was 110/60.

On July 15, 2011, plaintiff had an MRI of her left shoulder which was normal (Tr. at 566-569).

On July 21, 2011, plaintiff saw Dr. Latinis for a follow up on fibromyalgia (Tr. at 571-578). She was noted by the nurse to ambulate with difficulty and she rated her pain a 6 out of 10. Although the medical form includes a diagram for fibromyalgia tender points, it was not completed. "She has fibromyalgia points throughout." "Her pain from the fibromyalgia standpoint is doing fairly well. A combination analgesic therapy seems to be helping, and she is utilizing that benefit to increase her physical activity by swimming and walking on a regular basis, which I consider a success." Plaintiff's blood pressure was 127/74. She was alert and oriented, in no acute distress, with appropriate mood and affect. Plaintiff had full range of motion of her left shoulder albeit with "significant pain." Dr. Latinis noted plaintiff's normal shoulder MRI (other than a small amount of fluid), and she was able to swim on a regular basis. Dr. Latinis refilled all of plaintiff's narcotic pain prescriptions. He also put her on a very low dose of prednisone (steroid) for three months for her shoulder symptoms.

On August 24, 2011, plaintiff saw Jamie Zurcher, a nurse practitioner, complaining of headache every day with blurred vision and nausea (Tr. at 427-430). Plaintiff needed a refill

of Fioricet (barbiturate) for headaches. She stated that these headaches were not migraines. Her last migraine was 4 weeks earlier. Plaintiff said the Fioricet helps her tension headache pain go away. "She is also on a number of narcotics for what she calls fibromyalgia pain, as well as Soma [muscle relaxer] for sleep, Xanax for anxiety. She claims she can not take antidepressant drugs such as Cymbalta or Celexa or pain drugs such as Lyrica or Neurontin because they cause serious side effects such as suicidal thoughts that put her in psych wards. So she has to be on narcotics for her chronic pain. . . . She also mentions several times that she and her husband have a lot of financial problems right now. She has not worked since 2008." Plaintiff's current medications included OxyCodone HCl (four times a day), OxyContin (twice a day), and Percocet -- all narcotics. She rated her pain a 7. Plaintiff's blood pressure was 124/84. Plaintiff was prescribed Amitriptyline, an antidepressant. Ms. Zurcher wrote the following: "Discussed with patient that I feel the majority of her symptoms are related to Depression. She does not believe so. I explained to her that no[t] wanting to get out of bed, having no energy, being in pain, is all symptoms of depression. She disagreed with me and said she has been depressed before and she cried all the time, she does not cry now and feels that this is all related to her fibromyalgia. I explained to her that just because she cried before does not mean she will cry this time, and she is on a lot of medications that might alter that. She refuses to start any form of antidepressant because they will make her suicidal and states she is not depressed. I also explain[ed] to patient that I am not comfortable giving her Fioricet for her headache due to the amount of narcotics she is already taking. I discuss[ed] with her re-starting amitriptyline and she is ok with trying this medication again."

On October 19, 2011, plaintiff saw Dr. Latinis (Tr. at 579-586). She was observed by the nurse to be alert and oriented times three, and she ambulated with difficulty. She reported that she began using assistive devices for walking two months ago. She had been experiencing

dizziness and had fallen. Although the medical form includes a diagram for fibromyalgia tender points, it was not completed. Plaintiff reported no benefit with Prednisone. Dr. Latinis noted her normal shoulder MRI and wrote, "It is just a chronic soreness." Despite taking OxyContin and Oxycodone (both narcotics), plaintiff reported a pain level of 7 out of 10, but claimed those narcotics were "beneficial for her pain." She reported sleeping reasonably well. The only side effect of medication was constipation. Plaintiff's blood pressure was 156/78. She was in no acute distress, her mood and affect were appropriate. "She has fibromyalgia tender points throughout." Dr. Latinis refilled plaintiff's narcotics and her Soma (muscle relaxer) and Elavil (also called Amitriptyline, an antidepressant). He told her to follow up with her primary care physician for headaches. "I am not overly enthusiastic about her taking additional narcotics for headache treatment, as this is usually counterproductive, so I agree with discontinuing the Fioricet for now." He told her to return in three months.

On this same day, Dr. Latinis was presented with a Medical Source Statement; however, it included only plaintiff's diagnosis and prognosis (fair) (Tr. at 598).

On December 14, 2011, Dr. Latinis completed a Physical Assessment of Abilities to do Work-Related Activities (Tr. at 590-592). He found that plaintiff could lift up to 20 pounds occasionally, but no weight frequently and never more than 20 pounds. He found that plaintiff could carry up to 10 pounds occasionally, but no weight frequently and never over 10 pounds. He found that plaintiff could sit for 1 hour at a time and for a total of 4 hours per day. He found that plaintiff could stand for 1 hour total per day but not all at one time. He found that plaintiff could walk for 1 hour per day but not all at one time. These restrictions were due to fibromyalgia. He found that plaintiff could occasionally grasp and perform fine manipulation. She could occasionally climb and kneel, but she could never balance, stoop, crouch, or crawl. He found that she could occasionally reach, push and pull; and she could

frequently handle and feel. He found that she must avoid even moderate exposure to heights, moving machinery, vibration, noise, dust, fumes, odors, smoke (although his records show that plaintiff's husband smokes and that she is exposed to second hand smoke (Tr. at 577)), chemicals, wetness, and temperature extremes. She should avoid concentrated exposure to dryness. He noted that plaintiff does not require an assistive device for adequate ambulation. He did not know whether she would miss more than a day of work per month, he did not know whether she had a need to lie down or elevate her feet. He answered, "yes" to the question of whether plaintiff suffers any significant side effects of prescribed medication and wrote, "fatigue, constipation."

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge William Horne entered his opinion on February 22, 2012 (Tr. at 10-18). Plaintiff's last insured date was December 31, 2013 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12).

Ste two. Plaintiff suffers from the following severe impairments: fibromyalgia, migraine headaches, arthritis, affective disorder, and anxiety (Tr. at 12).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work including lifting and carrying 10 pounds frequently and occasionally, standing for 1 hour per day, walking for 1 hour per day, and sitting for 6 hours per day. She cannot work at heights or around moving machinery or operative automotive equipment. She must be allowed to alternate sitting and standing at 30 minute intervals, and she cannot frequently stoop or bend. She cannot repetitively reach with either arm, and she cannot lift from ground level. She cannot crawl, kneel, crouch or squat; she cannot repetitively twist or turn her body. She is

limited to simple, repetitive, low stress work tasks (Tr. at 14). With this residual functional capacity, plaintiff cannot perform her past relevant work as a machine operator, injection molding machine operator, clerical assistant, order clerk, or warehouse record clerk (Tr. at 16).

Step five. Plaintiff is capable of performing other jobs available in significant numbers, such as surveillance monitor and call out operator (Tr. at 17). Therefore, plaintiff is not disabled (Tr. at 17).

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible because he did not discuss all of the <u>Polaski</u> factors and instead relied only on the medical evidence that did not support plaintiff's allegations.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. <u>Rautio v. Bowen</u>, 862 F.2d 176, 178 (8th Cir. 1988); <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. <u>Gray v. Apfel</u>, 192 F.3d 799, 803 (8th Cir. 1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining

credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> . . . [C]laimant has complained of hip pain, but an x-ray of both hips and the pelvis was negative. She has complained of left shoulder pain. However, an x-ray showed no significant bony or joint abnormality. The diagnosis was of rotator cuff tendinitis. Treatment has included a DepoMedrol and lidocaine injection to the left shoulder. She also complains of fibromyalgia, and while physical examinations have noted fibromyalgia trigger points, treatment notes from both before and after her alleged onset date indicate she is doing well. Specifically, a June 2009 note stated that she was "doing much better, pain levels much better." She was told to continue on Percocet and Xanax. A July 2009 [record] stated she was doing "really well". An April 2010 treatment note stated she "has been doing very well recently. We got her pain control relatively optimized." In July 2010, which is at the time of her alleged onset date, a treatment note states that claimant's condition was deteriorating, but this was due to viral gastroenteritis, not fibromyalgia. However, a . . . July 2011 treatment note stated that she was doing "fairly well" from a fibromyalgia standpoint.

> There is no evidence of significant or disabling adverse side effects of medication as alleged by claimant, and while claimant has a fairly good work history, she has convinced herself that she cannot work and she may not be highly motivated to seek employment.

\* \* \* \* \*

In addition, as noted in the preceding finding, in a Function Report claimant acknowledged a good level of activities of daily living, including stating that she supervisors [sic] her children every morning, making sure they get to school, does household chores, makes meals, watches television, plays board games, lets the dog out, cleans dishes, folds laundry, takes online classes, and go[es] shopping, all of which demonstrates an intact level of functioning inconsistent with a finding of disability.

Claimant also alleges anxiety and depression, and although these impairments are mentioned occasionally in the underlying note[s] describing treatment for her physical impairments, there is no indication of significant treatment for mental and emotional impairments per se, which, together with claimant's good level of activities of daily living, convinces the Administrative Law Judge that claimant is not disable[d] due to mental and emotional impairments.

(Tr. at 15-16).

A careful review of the evidence in light of the Polaski factors establishes that the substantial evidence in the record supports the ALJ's credibility determination.

Plaintiff testified that she left college after two years because she had a cognitive impairment and could not concentrate, that her grades declined from a 4.0 GPA until she had to drop out in October 2010, and that fibromyalgia causes brain fog. Plaintiff did not submit any of her college records to substantiate this testimony, she never complained of brain fog to any doctor, and no cognitive impairments of any kind (not even minor) were ever noted by any doctor or nurse.

Plaintiff testified that she has memory issues. Plaintiff's testimony at the administrative hearing showed no sign of memory impairment. She was able to testify that she held a job for 58 days in 2008, that she missed 5 days of work while at that job, that 2 of the days she missed were for appointments she had before she started the job and the other 3 were for being too ill or sore to go to work. Plaintiff was able to testify that Percocet is Oxycodone with Acetaminophen and Acetaminophen can harm the liver. She was able to correct her attorney and the ALJ during the hearing as to particular facts, she knew the name of the holding company of a former employer, she knew the names and specific dosages of her medications,

she knew the definitions of different diseases. Furthermore, there is no allegation in any medical record of a difficulty with memory, and no memory impairment was ever observed by any medical provider.

Plaintiff described her pelvic pain currently as a 6 out of 10, but she also testified that she was able to work with her pelvic pain which was actually worse when she worked than it is now. This establishes that plaintiff's subjective rating of a "6" as far as pain severity is not something that would prevent her from working since pain worse than a 6 did not prevent her from working in the past.

Plaintiff testified that her pain is an 8 or a 9 out of 10 every day. However, plaintiff's medical records (combined with her testimony that she was able to work with pain greater than a 6 out of 10) suggest that her subjective pain rating may be on the high side: On June 17, 2010, she told Dr. Wheeler her pain was a 10 out of 10; however, he observed her to be in no acute distress. On July 7, 2010, she described her pain as a 7 out of 10, but again Dr. Wheeler observed her to be in no acute distress. On February 3, 2011, she described her pain as an 8 out of 10, yet Dr. Latinis described her as being in no acute distress. On February 28, 2011, plaintiff described her pain as an 8 out of 10. Dr. Latinis noted that she was in no acute distress, but he did comment that her anxiety level was a bit high "due to financial problems." On July 21, 2011, plaintiff described her pain as a 6 out of 10, but she was described by Dr. Latinis as being in no acute distress. On October 19, 2011, she described her pain as a 7 out of 10 and again was found to be in no acute distress.

Plaintiff testified that nothing helps her daily headaches. However, she specifically requested Fioricet (a barbiturate) for daily headaches and told Jamie Zurcher, a nurse practitioner, that Fioricet makes her headache pain go away.

Plaintiff testified that she has two panic attacks per week. Yet nowhere in any of plaintiff's medical records is there a report of panic attacks. Furthermore, she testified that she has always had panic attacks and was able to work for years despite having panic attacks and never missed work due to a panic attack.

Plaintiff testified that she has flashbacks and nightmares; however, plaintiff never reported either of these symptoms to any medical provider.

Plaintiff testified that she was diagnosed with post traumatic stress disorder; however, the only place that condition appears in the record is in the report of Dr. Isenberg (a non-examining physician) who listed it as one of plaintiff's complaints in connection with her disability case.

Plaintiff testified that she no longer drives; however, the reasons for her not driving are not consistent. She testified that she stopped driving because she caught herself going over the line but did not explain how that was caused by or related to any of her medical conditions. In her Function Report she first stated that she is able to drive, but then she said she does not currently drive because she only has a car with a manual transmission and it hurts her hip to push in the clutch.

As far as aggravating factors, plaintiff stated in her Function Report that "not having money" causes her stress which causes her to have anxiety attacks and increased physical pain. Stress from plaintiff's financial problems was noted in medical records of multiple providers. She testified at the hearing that she lost her job in 2008 and collected unemployment benefits until those ran out, and that she continued to look for work from 2008 through 2010 even though she was a college student at that time as well and was able to maintain a 4.0 grade point average as a full-time student. Her loss of employment income despite looking for work for two years, coupled with the exhaustion of her unemployment benefits and the stress of

having no money suggests that her motivation for seeking disability benefits is not totally related to her physical and mental condition.

She told Dr. Suarez in September 2010 that her hip pain was aggravated by lying down which is inconsistent with her testimony that she has to lie down most of the day for pain relief.

Plaintiff testified that her medications cause side effects including fatigue and dizziness. However, on September 13, 2010, plaintiff denied any side effects to Dr. Suarez. Plaintiff told Dr. Latinis on October 19, 2011, that the only side effect from her medication was constipation.

Plaintiff's treating rheumatologist consistently noted that her pain was adequately managed with medication. Plaintiff told Dr. Latinis that the narcotic pain medicine helped her pain, she told Ms. Zurcher that Fioricet helped her daily headaches. She denied depression and resisted antidepressants as a treatment for fibromyalgia, claiming they caused her to have suicidal thoughts, and she resisted anti-inflammatories as treatment claiming they caused stomach pain. Plaintiff testified that her pain even with narcotic medication is an 8 or a 9 out of 10 and the narcotics cause constipation pain (which she rated a 9 out of 10 when she saw Dr. Warren). It is unlikely a rheumatologist would continue plaintiff on the same medications for as long as he has been prescribing them to plaintiff if her relief from those medications only brought her pain down to an 8 or a 9 and her side effects caused pain rated a 9 out of 10. Dr. Latinis's description of plaintiff's pain as "adequately controlled" in his treatment records establishes that he did not believe plaintiff's pain from her medical condition or side effects was barely below "the worst pain ever experienced." His treatment notes deserve more weight than plaintiff's testimony that her pain is disabling, which is precisely what the ALJ stated in his order.

In addition to the objective medical evidence described by the ALJ, the above <u>Polaski</u> factors support the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not entirely credible.

## VII.   *OPINION OF DR. LATINIS*

Plaintiff argues that the ALJ erred in failing to give controlling weight to the December 14, 2011, Physical Assessment of Abilities to do Work-Related Activities in which Dr. Latinis found that plaintiff could lift up to 20 pounds occasionally, but no weight frequently and never more than 20 pounds; that she could carry up to 10 pounds occasionally, but no weight frequently and never more than 10 pounds; that plaintiff could sit for 1 hour at a time and for a total of 4 hours per day; that plaintiff could stand for 1 hour total per day but not all at one time; that plaintiff could walk for 1 hour per day but not all at one time; that plaintiff could occasionally grasp, perform fine manipulation, climb, kneel, reach, push and pull; that plaintiff could never balance, stoop, crouch, or crawl; that plaintiff could frequently handle and feel; that she must avoid even moderate exposure to heights, moving machinery, vibration, noise, dust, fumes, odors, smoke, chemicals, wetness, and temperature extremes; and that she should avoid concentrated exposure to dryness.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency

with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record.  20 C.F.R. §§ 404.1527, 416.927.

A review of Dr. Latinis's records after plaintiff's alleged onset date (June 20, 2010) reveals the following:  Plaintiff saw Dr. Latinis 6 times in the 18 months between her alleged onset date and when he completed the opinion at issue in this case, December 14, 2011.

◆   On July 13, 2010, he noted that plaintiff "has been well" except for viral gastroenteritis,  urinary tract infections, a yeast infection, and hives.  The only notation he made after performing a physical exam was, "Musculoskeletal exam reveals diffuse generalized tenderness."  He continued plaintiff on her same medications and told her to come back in three months.

◆   On October 14, 2010, the first time plaintiff was seen by Dr. Latinis after she applied for disability benefits, she was noted by his nurse to be using a cane.  Plaintiff's psychiatric exam was normal.  "Musculoskeletal exam is notable for multiple tender points in a fibromyalgia distribution."  Despite his medical form including a diagram for fibromyalgia tender points, he did not use it.  He noted that x-rays of her hips and pelvis were normal.  He continued her on the same narcotic pain medication, encouraged her to exercise, and told her to return in four months.

◆   On February 3, 2011, Dr. Latinis noted, "Musculoskeletal exam has fibromyalgia tender points along paraspinal muscles" which run along the spine.  No other tender points were noted.  He continued plaintiff on her same medications and told her to return in three months.

◆ On April 28, 2011, plaintiff first raised the issue of shoulder pain. Dr. Latinis noted that plaintiff's anxiety level was a bit high "due to family stressors, mostly financial." An x-ray of plaintiff's shoulder was normal. Dr. Latinis did not use the fibromyalgia tender points diagram in his medical record. Instead, he noted, "Musculoskeletal exam fibromyalgia tender points are positive. She had tenderness stressing her rotator cuff with internal-external and abduction, and also positive impingement sign." He gave her an injection in her shoulder, continued her on her same medications, and told her to return in three months.

◆ On July 21, 2011, Dr. Latinis did not complete the fibromyalgia tender point diagram, but wrote, "She has fibromyalgia points throughout. . . . Her pain from the fibromyalgia standpoint is doing fairly well. A combination analgesic therapy seems to be helping, and she is utilizing that benefit to increase her physical activity by swimming and walking on a regular basis, which I consider a success." He continued her on her same medications but added a "very low dose" of Prednisone for plaintiff's shoulder pain which had not kept her from swimming and was not caused by anything detectable by MRI as she had had one just the week before.

◆ On October 19, 2011, plaintiff told Dr. Latinis's nurse that she had started using a cane two months earlier, even though she showed up in his office with a cane a year before. She told the nurse that she had been experiencing dizziness and had fallen. Dr. Latinis did not even mention the alleged dizziness, the alleged fall, or the cane in his medical record. He described plaintiff's shoulder as a "chronic soreness" and stopped the very low dose of Prednisone. Plaintiff reported that the narcotics were "beneficial for her pain." She was sleeping reasonably well and having only constipation as a medication side effect. Dr. Latinis noted "fibromyalgia tender points throughout." He refilled her narcotic pain medication at the same doses and told her to return in three months.

Dr. Latinis's subsequent finding, in connection with plaintiff's disability case, that she could not sit for more than 4 hours per day, not stand for more than 1 hour per day, and not walk for more than 1 hour per day is entirely inconsistent with his treatment records which describe her regular swimming and walking as "a success" and which encourage plaintiff to perform aerobic exercise. It is also inconsistent with his answer "do not know" when asked whether plaintiff would have to lie down or elevate her feet during the day -- clearly if she can only sit, stand and walk for a total of 6 hours per day, she necessarily would need to lie down for a substantial part of each day.

His finding in the disability report that plaintiff must avoid even moderate exposure to smoke is inconsistent with his notation in his medical records that plaintiff's husband had resumed smoking and that she is exposed to second-hand smoke because the medical record did not indicate that even moderate exposure to smoke could not be tolerated as is indicated in his disability report.

His comment in the disability report that plaintiff's medications cause fatigue is inconsistent with his treatment record which clearly states that plaintiff suffers no side effects other than constipation.

As was noted during the administrative hearing, Dr. Latinis's opinion that plaintiff could only occasionally grasp and perform fine manipulation is inconsistent with his opinion that plaintiff could frequently handle and feel.

Dr. Latinis kept plaintiff on the same doses of the same medications during this entire 18-month period and repeatedly indicated that she was doing well. The ALJ was entitled to rely on Dr. Latinis's treatment records rather than the opinion he provided in connection with plaintiff's disability case because the disability opinion was inconsistent with Dr. Latinis's treatment records and the other medical evidence of record. For example, Dr. Wheeler

observed on multiple occasions that plaintiff's gait was normal (including just a few months before she was first seen using a cane). On July 9, 2010, Dr. Warren found no tenderness in any of plaintiff's extremities. It is noteworthy that plaintiff was not being treated for fibromyalgia during this examination. Two days later, on July 11, 2010, another emergency room physician found no tenderness in her back or extremities. Again, she was being treated for something other than fibromyalgia. Yet two days later when she saw Dr. Latinis for fibromyalgia, all of her fibromyalgia tender points were back.

Medical records by Dr. VandenBoom reflect that plaintiff has a history of methamphetamine use; however, it is unclear whether Dr. Latinis was aware of this history.

On February 14, 2011 (11 days after an appointment with Dr. Latinis), plaintiff had a back exam which was noted to be normal.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinion of Dr. Latinis in the December 14, 2011, physical assessment of abilities to do work-related activities.

## VIII.  CONCLUSIONS

Plaintiff's final argument, that the ALJ erred in relying on a hypothetical which did not accurately detail all of plaintiff's impairments, is based on the above arguments and is therefore without merit.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 23, 2014